David. C. McElhinney
Nevada Bar No. 33
Lewis Roca Rothgerber LLP
50 West Liberty Street, Suite 410
Reno, NV 89501-1922
Telephone: (775) 823-2900
Facsimile: (775) 823-2929
DMcelhinney@LRRLaw.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UBS Financial Services Inc., | CASE NO. 3:14-cv-00141-LRH-WGC |
| Plaintiff, | |
| vs. | **MOTION FOR:** |
| Carolyn Garrett; Garrett Bullock; Diann Martin; Jason Garrett, Catherine Hintzen; Bodhi Garrett; Re-Evaluation Counseling Community Resources, Inc.; Travis Garrett; Cynthia Mitchell, | **1. PERMISSION TO DEPOSIT FUNDS;** |
| | **2. DISCHARGE FROM LIABILITY;** |
| | **3. PERMANENT INJUNCTION; AND** |
| Defendants. | **4. COSTS AND ATTORNEYS' FEES** |

UBS Financial Services, Inc. ("UBSFS") moves for an order:

(i)    permitting it to deposit the funds in the investment account kept and maintained by UBSFS on behalf of The Jo Anne Garrett Family Trust (the "Account") with the Clerk of the Court;

(ii)    discharging UBSFS from any and all liability to Defendants for the funds in the Account and dismissing UBSFS from this action with prejudice;

(iii)    permanently enjoining the Defendants from commencing or prosecuting any action in any federal or state court against UBSFS relating to the Account; and

(iv)    awarding UBSFS its costs and reasonable attorneys' fees incurred in this action, to be paid from the funds in the Account.

This Motion is made pursuant to 28 U.S.C. §§ 1335, 2041 and 2361 and Fed. R. Civ. P. 22 and 67 and is supported by the following Memorandum of Points and Authorities.

4550758_1

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.      Factual Background.**

This is an interpleader action that arises out of competing claims to the Account.  UBSFS is a mere stakeholder and claims no right to the funds in the Account.

On August 12, 2002, Jo Anne Garrett established The Jo Anne Garrett Family Trust (the "Trust").  Jo Anne Garrett died on October 14, 2013.  Jo Anne Garrett's body was discovered in a wooded area near her home after she was reported missing on October 11, 2013.  At the time of her death, Jo Anne Garrett was the sole trustee of The Jo Anne Garrett Family Trust.

In December 2013, Peter J. Smith contacted UBSFS on behalf of Defendant Carolyn Garrett and requested that UBSFS recognize Carolyn Garrett as the successor trustee of the Trust. In connection with that request, Peter J. Smith sent a letter dated December 12, 2013 to UBSFS in which he enclosed (i) a photocopy of the Trust, (ii) a photocopy of an amendment to the Trust dated March 15, 2013, (iii) a photocopy of a Certificate of Independent Review, and (iv) a photocopy of Jo Anne Garrett's death certificate.   A copy of Peter J. Smith's letter dated December 12, 2013, along with enclosures, is attached as **Exhibit A**.

On January 2, 2014, counsel for UBSFS contacted Peter J. Smith by telephone to explain UBSFS's concerns about the validity of the March 15, 2013 amendment to the Trust and the application of NRS 155.097, which provides that a transfer "is presumed to be void if the transfer is effective on or after a transferor's death and the transfer is to a transferee who is … a caregiver of the transferor."  During this telephone call, counsel for UBSFS proposed that UBSFS and Carolyn Garrett jointly file a declaratory judgment action to determine the validity of the March 15, 2013 amendment to the Trust and the application of NRS 155.097.  On January 6, 2014, after consulting with Carolyn Garrett, Peter J. Smith rejected this proposal.

On January 7, 2014, counsel for UBSFS contacted Peter J. Smith by telephone and proposed contacting each of the individuals identified as beneficiaries in the Trust, prior to its amendment on March 15, 2013, to determine if those individuals had any claim to the Account. Peter J. Smith agreed to this proposal and stated that he would work with Carolyn Garrett to

LEWIS ROCA
ROTHGERBER

50 West Liberty Street
Suite 410
Reno, NV 89501-1922

LEWIS ROCA
ROTHGERBER

50 West Liberty Street
Suite 410
Reno, NV 89501-1922

1  obtain contact information for each of the individuals identified as beneficiaries in the Trust, prior

2  to its amendment on March 15, 2013.

3         On January 28, 2014, counsel for UBSFS received an email from Peter J. Smith in which

4  Peter J. Smith stated, for the first time, that he would not be representing Carolyn Garrett in

5  connection with the Trust and that all further correspondence regarding this matter should be sent

6  directly to Carolyn Garrett.  A copy of Peter J. Smith's January 28, 2014 email is attached as

7  **Exhibit B**.

8         On February 4, 2014, counsel for UBSFS sent a letter to Carolyn Garrett, which (i)

9  explained UBSFS's concerns about the validity of the March 15, 2013 amendment to the Trust

10 and the application of NRS 155.097, (ii) provided Carolyn Garrett with an overview of the

11 correspondence to date between counsel for UBSFS and Peter J. Smith, and (iii) advised Carolyn

12 Garrett to contact counsel for UBSFS to explore the options available to determine the validity of

13 the March 15, 2013 amendment to the Trust.  A copy of the February 4, 2014 letter to Carolyn

14 Garrett is attached as **Exhibit C**.

15        On February 19, 2014, counsel for UBSFS received a letter from Carolyn Garrett in which

16 she refused to submit the March 15, 2013 amendment to the Trust to a court of competent

17 jurisdiction to determine its validity and refused to assist UBSFS in determining whether the

18 individuals identified as beneficiaries in the Trust, prior to its amendment on March 15, 2013, had

19 any claim to the funds in the Account.  A copy of the letter counsel for UBSFS received on

20 February 19, 2014 is attached as **Exhibit D**.

21        After receiving and responding to numerous emails and letters from Carolyn Garrett over

22 the ensuing weeks – none of which addressed UBSFS's concerns about the validity of the March

23 15, 2013 amendment to the Trust or the application of NRS 155.097 – on March 10, 2014,

24 UBSFS sent letters via certified mail to each of the individuals identified as beneficiaries in the

25 Trust, prior to its amendment on March 15, 2013.  These letters (i) informed the recipients of

26 Carolyn Garrett's demand for distribution of the Account, (ii) enclosed a photocopy of the Trust

27 dated August 12, 2002 and a photocopy of the amendment to the Trust dated March 15, 2013, and

28 (iii) asked the recipients to contact counsel for UBSFS if they objected to the validity of the

4550758_1

March 15, 2013 amendment to the Trust.  UBSFS sent copies of each of these letters to Carolyn Garrett.  A representative sample of the letters UBSFS sent on March 10, 2014 is attached as **Exhibit E**.

On March 13, 2014, counsel for UBFS received a facsimile from Daniel Page, counsel for Diann Martin.  Diann Martin is Jo Anne Garrett's daughter and was identified as a beneficiary in the Trust, prior to its amendment on March 15, 2013.  In his facsimile, Daniel Page stated that Diann Martin objects to the validity of the March 15, 2013 amendment to the Trust and has retained him to contest the same.  Daniel Page also requested that UBSFS place a hold on the Account.  A copy of the facsimile UBSFS received on March 13, 2014 is attached as **Exhibit F**.

Faced with these competing claims to the funds in the Account, UBSFS filed this interpleader action.  Defendant Carolyn Garrett answered UBSFS's Complaint for Interpleader on April 10, 2014.  (Document 4).  Defendants Garrett Bullock, Diann Martin, Jason Garrett, Catherine Hintzen, Bodhi Garrett, Travis Garrett, and Cynthia Mitchell answered UBSFS's Complaint for Interpleader on May 8, 2014.  (Document 17).[1]

## II.   UBSFS Should be Permitted to Deposit the Funds with the Clerk of the Court.

UBSFS keeps and maintains the Account on behalf of The Jo Anne Garrett Family Trust and claims no right to the funds in the Account.  As a mere stakeholder, UBSFS is ready, willing and able to distribute the funds in the Account.  However, given the controversy that exists between the Defendants, UBSFS cannot distribute the funds in the Account without determining disputes questions of fact and law and thereby exposing itself to the potential of multiple liability.

In accordance with 28 U.S.C. §§ 1335 and 2041 and Fed. R. Civ. P. 67, UBSFS should be granted permission to deposit the funds in the Account with the Clerk of the Court.  *See General Acc. Group v. Gagliardi*, 593 F. Supp. 1080, 1087 (D. Conn. 1984) ("the general equitable

---

[1] While the answer filed by Defendants Garrett Bullock, Diann Martin, Jason Garrett, Catherine Hintzen, Bodhi Garrett, Travis Garrett, and Cynthia Mitchell is styled as a motion to intervene, the answer (i) challenges the validity of the March 15, 2013 amendment to the Trust, (ii) disputes Carolyn Garrett's right to the funds in the Account; and (iii) alleges that Carolyn Garrett exerted undue influence over Jo Anne Garrett.

LEWIS ROCA
ROTHGERBER

50 West Liberty Street
Suite 410
Reno, NV 89501-1922

1    powers of the court permit, if not invite, the court to receive a deposit and thereafter discharge the

2    stakeholder").

3    **III.    UBSFS is Entitled to Discharge, Dismissal and a Permanent Injunction.**

4    Once UBSFS has deposited the funds in the Account with the Clerk of the Court, UBSFS

5    will have satisfied any obligation it could have to the Defendants with respect to the funds in the

6    Account.  Pursuant to 28 U.S.C. § 2361, in an interpleader action, once a plaintiff has deposited

7    the disputed funds with the court, the court may "discharge the plaintiff from further liability,

8    make the injunction permanent, and make all appropriate order to enforce its judgment."  UBSFS,

9    as a mere stakeholder, should be discharged from any and all liability to Defendants for the funds

10   in the Account and dismissed from this action with prejudice once it deposits the funds in the

11   Account with the Clerk of the Court.  *See Hudson Sav. Bank v. Austin*, 479 F.3d 102, 107 (1st Cir.

12   2007) ("[I]n an interpleader action in which the stakeholder does not assert a claim to the stake,

13   the stakeholder should be dismissed immediately following its deposit of the stake into the

14   registry of the court.  That dismissal should take place without awaiting an adjudication of the

15   defendants' competing claims."); *Central Bank v. United States*, 838 F. Supp. 564, 567 (M.D. Fla.

16   1993) ("The law normally regards the plaintiff in an interpleader action as having been

17   discharged of full responsibility regarding the interpleaded funds when the funds have been paid

18   into the registry of the court ....").

19   In addition to being discharged from any and all liability to the Defendants for the funds

20   in the Account and dismissed from this action with prejudice, the Defendants should also be

21   permanently enjoined from commencing or prosecuting any suit or action against UBSFS relating

22   to the Account.  Pursuant to 28 U.S.C. § 2361, in an interpleader action a district court is

23   permitted to "enter its order restraining [claimants] from instituting or prosecuting any proceeding

24   in any State or United States court affecting the property, instrument or obligation involved in the

25   interpleader action until further order of the court."  A permanent injunction is particularly

26   important in this case, where UBSFS will satisfy its obligation to the Defendants by depositing

27   the funds in the Account with the Clerk of the Court.  *See Commercial Union Ins. Co. of New*

28   *York v. Adams*, 231 F. Supp. 860, 868 (Ind. 1964) ("in order to relieve the assured from the

LEWIS ROCA
ROTHGERBER

50 West Liberty Street
Suite 410
Reno, NV 89501-1922

burden of defending a multiplicity of action over a period of many years, and more especially to make it possible to distribute the fund created by plaintiff in an equitable manner, the court will enter an order restraining all claimants from instituting or prosecuting any proceeding in any state or United States court affecting the property involved in this interpleader action …."); *Orseck, P.A. v. Servicios Legales de Mesoamerica S. De R.L.*, 699 F. Supp. 2d 1344, 1351 (S.D. Fla. 2010) (issuing injunction in interpleader action to "protect the stakeholder from vexatious and multiple litigation").

## IV.    UBSFS Should Be Awarded Its Costs And Attorneys' Fees.

Because it became necessary for UBSFS to institute this interpleader action, despite repeated attempts to facilitate a resolution without judicial intervention, UBSFS should be awarded the reasonable attorneys' fees and costs it incurred in this action. *See Trustees of the Directors Guild of Am. v. Tise*, 234 F.3d 415, 426 (9th Cir. 2000) ("the availability of attorneys' fees for interpleader plaintiffs recognizes that by bringing the action, the plaintiff benefits all parties by promoting early litigation on the ownership of the fund, thus preventing dissipation"); *Rhoades v. Casey*, 196 F.3d 592, 603 (5th Cir. 1999) ("fees are available when the interpleader is a disinterested stakeholder and is not in substantial controversy with one of the claimants"); *Schrimer Stevedoring Co., v. Seaboard Stevedoring Corp.*, 306 F.2d 188, 194 (9th Cir. 1962) ("the proper rule … in an action in the nature of interpleader, is that the plaintiff should be awarded attorney fees for the services of his attorneys in interpleading").

UBSFS's reasonable attorneys' fees and costs should be paid from the funds in the Account and not by any particular Defendant. *See Aaron v. Mahl*, 550 F.3d 659, 667 (7th Cir. 2008) ("courts often award attorneys' fees from the interpleader stake"); *Prudential Ins. Co. v. Boyd*, 781 F.2d 1494, 1497–98 (11th Cir. 1986) ("costs and attorneys' fees are generally awarded, in the discretion of the court, to the plaintiff who initiates the interpleader as a mere disinterested stake holder" and are taxed "against the interpleader fund"); *Globe Indem. Co. v. Puget Sound Co.*, 154 F.2d 249, 250 (2nd Cir. 1946) ("the plaintiff in interpleader is entitled to costs (usually including a reasonable attorney's fee) to be paid out of the fund brought into court").

50 West Liberty Street
Suite 410
Reno, NV 89501-1922

LEWIS ROCA
ROTHGERBER

UBSFS therefore moves for an award of the costs and reasonable attorneys' fees it has incurred in this interpleader action, subject to UBSFS's filing and this Court's approval of an itemization of UBSFS's attorneys' fees and a bill of costs.

**V.      Conclusion.**

UBSFS respectfully requests the following relief:

A.      an order permitted UBSFS to deposit the funds in the Account with the Clerk of the Court;

B.      an order discharging UBSFS from any and all liability to Defendants for the funds in the Account and dismissing UBSFS from this action with prejudice;

C.      an order permanently enjoining the Defendants from commencing or prosecuting any action in any federal or state court against UBSFS relating to the Account

D.      an order awarding UBSFS its costs and reasonable attorneys' fees incurred in this action, to be paid from the funds in the Account, subject to UBSFS's filing and this Court's approval of an itemization of UBSFS's attorneys' fees and a bill of costs; and

E.      for any other relief the Court deems just and proper.

Dated this 22 day of _____May_____, 2014.

LEWIS ROCA ROTHGERBER LLP


By: _David C. McElhinney_____
      DAVID C. McELHINNEY, ESQ.
      50 W. Liberty Street, Suite 410
      Reno, Nevada 89501
      *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused to be delivered, via U.S. Mail, postage prepaid, a copy of the foregoing document to the following:

Zachary A. Gerber, Esq.
Gerber Law Offices, LLP
491 4th Street
Elko, Nevada 89801
*Attorneys for Defendant Carolyn Garrett*

Bret Whipple, Esq.
Justice Law Center
1100 South 10th Streeet
Las Vegas, Nevada 89104
*Attorneys for Defendants Garrett Bullock, Diann Martin, Jason Garrett, Catherine Hintzen,*
*Bodhi Garrett, Travis Garrett, and Cynthia Mitchell*

Re-Evaluation Counseling Community Resources
719 Second Avenue North
Seattle, Washington 98109

Dated this 22nd day of _____May_____ 2014.


_____
An employee of Lewis Roca Rothgerber LLP

4550758_1

# EXHIBIT A

# EXHIBIT A

December 12, 2013

Peter J. Smith
Attorney at Law

755 No. Roop St. # 108
Carson City, NV 89701
{775} 882-9441
Fax   882-9056

Joy A. Weber
Deputy General Counsel
UBS Finanical Services, Inc.
1000 Harbor Blvd.  8th fl
Weehawken, NJ  07086

      Re: Jo Anne Garrett

Dear Ms. Weber:

      During June and July of 2002 I discussed with Jo Anne Garrett the preparation of an inter vivos revocable trust for her, to manage and to arrange for the distribution of her estate.

      On August 9, 2002, I mailed to her the Declaration of Trust which I had prepared and on August 24, 2002 she mailed the signed and notarized original back to my office. A true copy of that original is enclosed for your reference.  It shows Mrs. Garrett's signatures on August 12, 2002, before the Justice of the Peace in Baker, Nevada.  That original has remained in my file since that time.

      On March 1, 2013, I spoke to Jo Anne Garrett about some changes she wanted to make to the terms of her Declaration of Trust, changing the distribution upon her death to favor her daughter Carolyn Garrett.  I was aware at the time that Carolyn was Jo Anne's primary care giver and I made a point of discussing these matters with Jo Anne when Carolyn was not present.

      There is a statute in Nevada that appears to create a presumption of undue influence when an elderly or infirm person makes transfers of property in favor of a primary care giver.  The statute allows for a professional to complete a statement indicating that the transferor was of sound mind and free of undue influence so as to overcome the contrary presumption.  I was satisfied that there was no undue influence in this case and I completed a Certificate of Independent Review which  I signed on March 5, 2013.  A true copy of that Certificate is also enclosed for your reference.

      A true copy of the March, 2013 Amendments in enclosed for your reference also.

      I hereby certify, under penalty of perjury, that the enclosed copy of the Declaration of Inter Vivos Trust is a true copy of the original on file in my office.  I further certify, under penalty of perjury, that the enclosed copy of the Amendments to the Jo Anne Garrett Family Trust is identical  in wording and form to the same document prepared by me at the instruction of UBS/Garrett

Member of the Bar
Nevada and California

December 12, 2013
Page 2


Jo Anne Garrett and which I had mailed to her on March 5, 2013, except for the addition of her signature notarized on March 15, 2013.

I am also enclosing a copy of an article about Jo Anne Garrett that appeared in this week's edition of High County News, just to give you some feel for the deceased.

Please feel free to call or write this office if I can be of any service to you.

Yours truly,

Peter J. Smith


PJS:pat
encs.

enc - Copy of Death Certificate

# DECLARATION OF INTER VIVOS   TRUST
## JO ANNE GARRETT FAMILY TRUST

### ARTICLE I:   IDENTIFICATIONS

The parties to this Trust are identified as shown below, and all references in this Trust Instrument to these parties are references to the persons designated:

1.1  SETTLOR:  JO ANNE GARRETT

1.2  TRUSTEE:  JO ANNE GARRETT

1.3  SUCCESSOR TRUSTEES:  JO ANNE GARRETT shall be the Trustee for so long as she is able and willing to serve or until her death, resignation or incapacity.  In the event that JO ANNE GARRETT can no longer serve as trustee, CYNTHIA K. MITCHELL of 530 Colgate Court, Reno, NV, 89503 shall act as the successor trustee for so long as she is able and willing to serve or until her death, resignation or incapacity.  In the event that CYNTHIA K. MITCHELL can no longer serve as trustee, she or a court of competent jurisdiction shall name an independent successor trustee for this trust.

1.4  BENEFICIARIES:  The Settlor shall be the beneficiary of this trust for her lifetime and her children CAROLYN GARRETT, DAVID GARRETT and DIANN MARTIN, and her grandchildren, GARRETT BULLOCK, BODHI GARRETT, JASON TODD GARRETT, TRAVIS GARRETT and CATHERINE HINTZEN and also REEVALUATION COUNSELING of Seattle, Washington, shall be the residuary beneficiaries of the trust.

### ARTICLE II:   DECLARATION OF INTENT

2.1  DECLARATION:  The Settlor hereby declares that all of her real property, including her home and 5 Acres, the deed of trust on what is called Carolyn's home and 15 acres and the obligation to the Settlor secured thereby, and the Settlor's other 11 acres unless sold, all in Baker, White Pine County, Nevada, assessors' parcel numbers 5-651-02, 5-651-32 and 5-651-08 and all of Settlor's personal property, including her Resource Management Account # 142009011 and her USB PaineWebber account at P.O. Box 7028, Billings, Montana 59103, her household furnishings, vehicles and equipment; the debt of DiAnn Martin to the Settlor, which is now about $17,000, the debt of Catherine Hintzen to the Settlor, which is now about $19,000, both from the loans of $23,000 to each of them made by the Settlor in 1999; and the obligations of Susan Geary to the Settlor with an approximate present balance of $17,000, shall be deemed transferred to this

Garrett Family Trust Page 1

trust to be held for her lifetime for her exclusive enjoyment, and the Trustee hereby declares that she will hold said residence and these other items of real and personal property, and any proceeds of any sale thereof according to the terms and conditions of this Trust.

The Settlor may also provide in her will, or by the designation of this trust as a beneficiary of any account or other contractual rights, for the distribution of any property, right, title or interest held by her free of this trust at the time of her death, into this trust.

2.2  <u>INTENT</u>:  It is the Settlor's intent to create a Revocable Inter Vivos Trust for the purpose of providing for the management of Trust Assets during her life whether she is competent or incompetent.  It is intended that the assets transferred to this Trust shall not be subject to administration in the Settlor's probate estate, if any, and that all Trusts created herein shall be administered without ongoing Court supervision to the greatest extent possible.

## ARTICLE III:  DURING THE SETTLOR'S LIFETIME

3.1  <u>TO OR FOR THE SETTLOR</u>:   During the lifetime of the Settlor, the Trustee shall allow the Settlor to make full use and benefit of the trust assets as she sees fit, subject to her ongoing obligation to provide for the care and maintenance thereof and for payment of any obligations secured thereby.

3.2  <u>GENERAL POWER OF APPOINTMENT</u>:  In addition, during her lifetime, the Settlor shall have the general power to appoint and otherwise direct the distribution of Trust Assets to any one or more persons or entities which the Settlor may exercise by amending this Trust Instrument or by giving instructions to the Trustees.

3.3  <u>Additional contributions to Trust</u>:  The Settlor may make additional contributions to this trust during her lifetime or through her Last Will and Testament effective upon her death.

## ARTICLE IV:  UPON THE SETTLOR'S DEATH

4.1  <u>Sale of Residence</u>:  Upon the Settlor's death the Settlor's residence and all of the other assets held in this trust shall be distributed either in kind or in cash to the residuary beneficiaries of this trust as set forth below.  The residence may be sold with or without a licensed real estate broker for the

Garrett Family Trust Page 2

best price as may be obtained by the Trustee within a reasonable time.

4.2 <u>Use of Residence:</u>  The Trustee is instructed to use the residence after the death of the Settlor for the distribution of any personal property to the residuary beneficiaries and to prepare the house for sale if it is to be sold to persons who are not named as beneficiaries of this trust.

## ARTICLE V: MANAGEMENT OF THE TRUST

5.1  <u>STATUTORY POWERS:</u>  The Trustee is hereby granted all of the powers itemized in Sections 163.265 through 163.410 of the Nevada Revised Statutes (as amended and supplemented from time to time), which are incorporated herein by this reference and the Trustee shall use that level of discretion in making investments of the trust assets that an intelligent business person would use in the management of their own affairs.

5.2  <u>TITLE TO TRUST PROPERTY:</u>  The Trustee may hold securities and other property in the name of the Trust; in the Trustee's name, as the Trustee under this Trust; or in the name of a nominee (including the Trustee, individually).  The Trustee may also hold securities and other assets unregistered so that ownership will pass by delivery.

5.3  <u>PURCHASES AND SALES:</u>  The Trustee may invest and reinvest the proceeds now or hereafter held in trust upon such terms and conditions and for such consideration as the Trustee deems advisable.

5.4  <u>TAX ELECTIONS:</u>  The Trustee may make any election which, in the Trustee's judgment, will have the effect of minimizing the tax liability of the Trust and/or its intended beneficiaries, and the Trustee shall not be liable to any beneficiary for his good faith exercise of the discretionary power hereby conferred.  A Trustee shall not be liable to remainder, contingent, or other beneficiaries in the future if the Trustee makes a tax election which favors the Trust's current beneficiaries.

5.5  <u>UNNAMED TRUSTEE:</u>  If the office of Trustee becomes vacant, and no named successor is able and willing to act, then any person or corporation authorized by law to act as fiduciary may be appointed by the first named Trustee or the successor Trustee shall be appointed by a court of competent jurisdiction.

Garrett Family Trust Page 3

5.7 SPENDTHRIFT TRUST:  The Trust created under this instrument shall be a Spendthrift Trust within the meaning of Nevada Revised Statutes, Chapter 166.  Except with respect to the beneficial interests of a Settlor in assets contributed by that Settlor, no interest in the principal or income of any Trust created hereunder shall be subject to voluntary or involuntary anticipation.  No interest hereunder may be assigned, encumbered, pledged, or subjected to the claims of or legal process by a beneficiary's creditors.  All transfers in violation hereof are void.

5.8 REVOCATION:  The Settlor may revoke the Trust at any time for so long as she is alive. Upon the revocation of the Trust the Trustee shall distribute to the Settlor all Trust Assets and the Trust shall be terminated.  Any revocation shall be evidenced by a Certificate of Revocation which shall be signed by the revoking Settlor and acknowledged before a Notary Public, and, if appropriate, recorded in the office of the recorder in each county in which any Trust real property is located.

5.9 AMENDMENT:  This Trust may be amended by the Settlor during her lifetime.

5.10 POWERS OF SETTLOR:  The powers of the Settlor to amend and revoke the Trusts are personal to her and may not be exercised by any one else.

5.11 EXPENSES AND FEES:  The Trustee and her successor may charge the trust estate for reimbursement of any actual reasonable expenses incurred in the management of the trust estate and the Trustee or successor Trustee may receive compensation for services rendered, not in excess of two per cent of the amount of assets held in the trust in any calendar year.

## ARTICLE VI: RESIDUARY BENEFICIARIES

6.1 Post Mortum:  After the death of the Settlor the Trustee shall hold and invest the assets of the trust for only so long as is necessary to affect a distribution of those assets to the residuary beneficiaries.

6.2 Distribution: The Residuary Beneficiaries named above may take their shares of the remaining trust assets either in cash or in kind and the Trustee shall determine a fair value of any trust asset that is not in the form of cash or liquidated into cash or a cash equivalent.

Garrett Family Trust Page 4

The shares of the trust assets, after payment of the just debts of the Settlor and the expenses of the administration of the trust shall be as follows:

| | | |
|---|---|---|
| CAROLYN GARRETT | 26 & 2/3% | *Deceased* |
| DAVID GARRETT | 26 & 2/3% | |
| DIANN MARTIN | 26 & 2/3% | |
| GARRETT BULLOCK | 3 & 1/3% | *Trust – David's Son* |
| BODHI GARRETT | 3 & 1/3% | |
| JASON TODD GARRETT | 3 & 1/3% | |
| TRAVIS GARRETT | 3 & 1/3% | |
| CATHERINE HINTZEN | 3 & 1/3% | |
| REEVALUATION COUNSELING | 3 & 1/3% | |

6.3  Advancements and Ademptions:  From time to time the Settlor may make transfers or gifts of assets from her personal property or from the assets held by this trust to one or more of the residuary beneficiaries of this trust, which transfers or gifts shall be deemed as advancements or ademptions of the shares that such residuary beneficiary would otherwise expect to receive form the trust upon the death of the Settlor. Any such advancement or ademption shall be identified as such by a written memorandum signed contemporaneously by the Settlor.

6.4  Ademptions to Date:  Specifically, the Settlor hereby declares that, if at the time of the death of the Settlor there remains any balance of the debt of DiAnn Martin to the Settlor, which is now about $17,000, or of Catherine Hintzen to the Settlor, which is now about $19,000, from the loans of $23,000 to each of them made by the Settlor in 1999, any such remaining balance shall be treated by the successor trustee as having been an ademption or advancement to DiAnn Martin and Catherine Hintzen when calculating the distribution of the assets of this trust to the residuary beneficiaries.
of the

6.5  Residuary Beneficiaries Under 24 Years of Age:  In the event that any residuary beneficiary of this trust, including an unnamed issue of named beneficiaries of this trust, has not reached the age of 24 years at the time of the death of the Settlor, the Trustee shall retain, distribute to or apply for the benefit of that Residuary Beneficiary of the this Trust so much of the trust income or principal of that beneficiary's trust share as the Trustee, in the Trustee's discretion deems necessary for the beneficiary's proper education, maintenance, support, and health with primary consideration given for educational purposes.

Garrett Family Trust Page 5

The term "education" shall be construed to include grade school, college, vocational and postgraduate study, so long as pursued to advantage by the beneficiary at an institution of the beneficiary's choice, and in determining payments to be made for such education, the Trustee shall take into consideration the beneficiary's related living and traveling expenses to the extent that they are reasonable and shall consider the other sources of income and support available to that residuary beneficiary.

Any assets and income of this trust retained for the benefit of any residuary beneficiary that has not achieved the age of 24 years but not distributed before the 24th birthday of any such residuary beneficiary shall then be distributed to him or her free of trust.

Prior to the 24th birthday of any residuary beneficiary of this trust the Trustee may keep the various funds and assets of the residuary beneficiaries in joint accounts and shall only be responsible for making an approximately accurate distribution of the shares of each, it being understood that interest and dividends will fluctuate with the passage of time and the expense of overly precise bookkeeping can exceed the benefit.

6.6 <u>Trust Management, Powers</u>:

A: <u>Statutory Powers</u>: The Trustee is hereby granted all of the powers itemized in Sections 163.265 through 163.410 of the Nevada Revised Statutes (as amended and supplemented from time to time), which are incorporated herein by this reference.
B: <u>Specific Powers</u>: The Settlor authorizes the Trustee to invest and reinvest any surplus monies in the Trustee's hands in any kind of property, real, personal, or mixed and every kind of investment, specifically including, but not limited to, interest-bearing accounts, corporate obligations of every kind, preferred or common stocks, mutual funds, or common trust funds, including funds administered by our Trustee, that persons of prudence, discretion, and intelligence acquire for their own account.
The Settlor further authorizes the Trustee to sell, with or without notice, at either public or private sale, and to lease any property belonging to my estate, subject only to such confirmation of Court as may be required by law.
C: <u>INVESTMENT POWERS</u>: In investing, reinvesting, purchasing, acquiring, exchanging and selling property for the benefit of this trust, the Trustee shall exercise the judgment and care, under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in

Garrett Family Trust Page 6

regard to the permanent disposition of their funds considering the probable income as well as the probable safety of their capital.

   6.7  <u>Unspent Shares:</u>  In the event that any of the residuary beneficiaries named herein fail to survive the Settlor or the distribution of the assets of this trust then the portion of the trust assets that would have been distributed to that residuary beneficiary shall instead be divided among his or her surviving issue, if any, by right of representation or if he or she leaves no surviving issue, then among the remaining residuary beneficiaries named herein in the same portions as shown in the preceding paragraph.

## ARTICLE VII CERTIFICATE OF TRUST

   7.1  A Certificate of Trust shall be prepared and recorded identifying the parties named herein and the real property that is the major asset of this trust.

   **SIGNED** this _12th_ day of _August_, 2002

Granting these powers and assets, _____
                                   JO ANNE GARRETT, Settlor

Accepting the duties of Trustee, _____
                                   JO ANNE GARRETT, Trustee

## A C K N O W L E D G E M E N T

STATE OF NEVADA        )
              s/s
County of White Pine   )

   On the _12th_ day of _Aug._, 2002, personally appeared before me, a Notary Public in and for said County and State, JOANNE GARRETT and proved to me to be the person whose name is subscribed to the above instrument and who acknowledged that she executed the instrument.

WITNESS my hand and official seal.

                                   _____
                                   ~~NOTARY PUBLIC~~    JUSTICE OF PEACE
                                                        Baker Township
                                                        Baker, Nevada

Garrett Family Trust Page 7

OCT-21-2013 01:12 PM  REI DRILLING INC.                775 234 7288                      P.01

# AMENDMENTS TO THE

## JO ANNE GARRETT FAMILY TRUST

Recognizing that, since the date of the Declaration of Inter Vivos Trust for the Jo Anne Garrett Family Trust executed August 12, 2002, David Garrett has passed away and that various other circumstances have changed; and

Recognizing that it would be fitting and proper for CAROLYN GARRETT or CHRISTINE KOLISCH to act as the Successor Trustee for this Trust when the Trustor Jo Anne Garrett is no longer willing or able to act as Trustee; and

Recognizing that Paragraph 5.9 of the Declaration of Trust allows for the Trustor to amend the terms of this trust during her lifetime;

NOW THEREFORE the undersigned Trustor Jo Anne Garrett hereby amends the language of Paragraph 1.3 of the Declaration of Trust for the Jo Anne Garrett Family Trust by deleting any reference to Cynthia K. Mitchell and by naming CAROLYN GARRETT to act as the successor trustee of said Trust, and by naming CHRISTINE KOLISCH to act as the alternate successor trustee of the said trust; and

The Trustor advises any successor trustee to confer with the persons named as Residuary Beneficiaries in the language amending Paragraph 6.2 below for any major decision concerning the management of this trust, but not necessarily to be bound by their advice.

The Trustor Jo Anne Garrett further amends the language of Paragraphs 2.1 and 6.4 to state that all of the personal obligations to her and to the trust of the individuals named in said paragraphs have been paid in full or forgiven; and

The Trustor further amends the language of Paragraph 6.2 regarding the distribution of the assets held in trust after her death by deleting all language regarding distributions to the persons previously named as beneficiaries and the Trustor instead directs that all of the assets held by the trust at the time of her death be distributed to CAROLYN GARRETT if she survives the Trustor, or otherwise to CHRISTINE KOLISCH if she survives the Trustor. If both CAROYN GARRETT and CHRISTINE KOLISCH fail to survive the Trustor then the assets held in this

OCT-21-2013 01:13 PM   REI DRILLING INC.

trust at the time of the death of the Trustor shall all be distributed to BODHI GARRETT.

The Trustor advises CAROLYN GARRETT, CHRISTINE KOLISCH and BODHI GARRETT that they are under no legal or moral obligation to share any of the proceeds of this trust with any other persons.

The Trustor Jo Anne Garrett recognizes that these amendments do not provide for the distribution of any of the trust assets to her daughter DiAnn Martin.

The Trustor corrects a typographical error in paragraph 6.3 so that the spelling of from is not *form*.

All of the remaining terms of said trust are reconfirmed with the intention that these amendments shall henceforth be applied to the operation and management of this trust and to the final distribution of the trust assets after the death of the Trustor Jo Anne Garrett.

Signed March 15, 2013

JO ANNE GARRETT, Trustor

## ACKNOWLEDGEMENT

STATE OF NEVADA          )
                         s/s
COUNTY OF WHITE PINE)

On the 15th day of March_____, 2013 personally appeared before me, a Notary Public in and for said County and State,   JO ANNE GARRETT, and proved to me to be the person whose name is subscribed to the above instrument and who acknowledged that she executed the instrument.

WITNESS my hand and official seal.

NOTARY PUBLIC

TRACY ROBISON
NOTARY PUBLIC-STATE of NEVADA
White Pine County · Nevada
CERTIFICATE # 99-12738-17
APPT. EXP. DEC. 22, 2015



Peter J. Smith
Attorney at Law
360 West Second Street
Carson City, Nevada 89703
(775) 882-9441
(775) 882-9056 - Fax

## CERTIFICATE OF INDEPENDENT REVIEW
Ref. NRS 155.093 et seq.

I, Peter J. Smith, have reviewed the Amendments to the Jo Anne Garrett Family Trust and the Durable Power of Attorney both prepared by me, and have counseled my client, Jo Anne Garrett, on the nature and consequences of the transfer or transfers of property and powers to Carolyn Garrett contained in the transfer instrument. I have also instructed her on how to arrange for the reconveyance of her deed of trust from Carolyn Garrett.

I am disassociated from the interest of the transferee to the extent that I am in a position to advise my client independently, impartially and confidentially as to the consequences of the transfer.

On the basis of this counsel, I conclude that the transfer or transfers of property and powers in the transfer instrument that otherwise might be invalid pursuant to NRS 155.097 are valid because the transfer or transfers are not the product of fraud, duress or undue influence.

Signed  March 5, 2013

_____
Peter J. Smith, Esq.

Member of the Bar
Nevada and California

# STATE OF NEVADA
## CERTIFICATION OF VITAL RECORD

### DEPARTMENT OF HEALTH AND HUMAN SERVICES
#### DIVISION OF HEALTH
#### VITAL STATISTICS
### CERTIFICATE OF DEATH

STATE FILE NUMBER **2013017418**

**TYPE OR PRINT IN PERMANENT BLACK INK**

| | | |
|---|---|---|
| 1a. DECEASED-NAME (FIRST, MIDDLE, LAST, SUFFIX) | 2. DATE OF DEATH (Mo/Day/Year) | 3a. COUNTY OF DEATH |
| Jo Anne GARRETT | October 14, 2013 | White Pine |

**DECEDENT**

| | | | |
|---|---|---|---|
| 3b. CITY, TOWN, OR LOCATION OF DEATH | 3c. HOSPITAL OR OTHER INSTITUTION -Name(if not either, give street and number) | 3d. if Hosp. or Inst. indicate DOA/OP/Emer. Rm. Inpatient(Specify) | |
| Rural White Pine County | 25 miles W of Hwy 488 South Jo's Way | Rural White Pine County | |

| | | | | |
|---|---|---|---|---|
| 5. RACE White (Specify) | 6. Hispanic Origin? Specify No - Non-Hispanic | 7a. AGE-Last birthday (Years) 88 | 7b. UNDER 1 YEAR 7c. UNDER 1 DAY MOS. DAYS HOURS MINS | 8. DATE OF BIRTH (Mo/Day/Yr) April 30, 1925 | 4. SEX Female |

**IF DEATH OCCURRED IN INSTITUTION RE:HANDBOOK REGARDING COMPLETION OF RESIDENCE ITEMS**

| | | | | |
|---|---|---|---|---|
| 9a. STATE OF BIRTH (If not U.S.A. name country) Montana | 9b. CITIZEN OF WHAT COUNTRY United States | 10.EDUCATION 15 | 11. MARRIED, NEVER MARRIED, WIDOWED, DIVORCED (Specify) Widowed | 12. SURVIVING SPOUSE (if wife, give maiden name) |

| | | | |
|---|---|---|---|
| 13. SOCIAL SECURITY NUMBER 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 | 14a. USUAL OCCUPATION (Give Kind of Work Done During Most of Working Life, Even if Retired) Activist/homemaker | 14b. KIND OF BUSINESS OR INDUSTRY At Home | Ever in US Armed Forces? No |

| | | | | |
|---|---|---|---|---|
| 15a. RESIDENCE - STATE Nevada | 15b. COUNTY White Pine | 15c. CITY, TOWN OR LOCATION Baker | 15d. STREET AND NUMBER Hwy 488 South Jo's Way | 15e. INSIDE CITY LIMITS (Specify Yes or No) No |

**PARENTS**

| | |
|---|---|
| 16. FATHER/PARENT - NAME (First Middle Last Suffix) Harold Joseph BROWN | 17. MOTHER/PARENT - NAME (First Middle Last Suffix) Mary Louise MULLOWNEY |

| | |
|---|---|
| 18a. INFORMANT-NAME (Type or Print) Carolyn GARRETT | 18b. MAILING ADDRESS (Street or R.F.D. No., City or Town, State, Zip) P.O. Box 11 Baker, Nevada 89311 |

**DISPOSITION**

| | | |
|---|---|---|
| 19a. BURIAL, CREMATION, REMOVAL, OTHER (Specify) Burial | 19b. CEMETERY OR CREMATORY - NAME Baker Cemetery | 19c. LOCATION City or Town State Baker Nevada 89311 |

| | | |
|---|---|---|
| 20a. FUNERAL DIRECTOR - SIGNATURE(if Personal Acting as Such) NICOLE ROMERO SIGNATURE AUTHENTICATED | 20b. FUNERAL DIRECTOR LICENSE 101 | 20c. NAME AND ADDRESS OF FACILITY Mt. Vista Chapel P.O. BOX 151707 Ely, NV 89315 |

**TRADE CALL - NAME AND ADDRESS**

**CERTIFIER**

| | |
|---|---|
| 21a. To the best of my knowledge, death occurred at the time, date and place and due to the cause(s) stated. (Signature & Title) | 22a. On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) stated. (Signature & Title) DARREN WALLACE SIGNATURE AUTHENTICATED |
| 21b. DATE SIGNED (Mo/Day/Yr) | 21c. HOUR OF DEATH | 22b. DATE SIGNED (Mo/Day/Yr) October 24, 2013 | 22c. HOUR OF DEATH 15:56 |
| 21d. NAME OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER (Type or Print) | 22d. PRONOUNCED DEAD (Mo/Day/Yr) October 14, 2013 | 22e. PRONOUNCED DEAD AT (Hour) 15:56 |
| 23a. NAME AND ADDRESS OF CERTIFIER (PHYSICIAN,ATTENDING PHYSICIAN, MEDICAL EXAMINER, OR CORONER) (Type or Print) DARREN WALLACE  1795 Great Basin Blvd. Ely, NV 89301 | 23b. LICENSE NUMBER 311 |

**REGISTRAR**

| | | |
|---|---|---|
| 24a. REGISTRAR (Signature) REBECCA SALAYO SIGNATURE AUTHENTICATED | 24b. DATE ACCEPTED BY LOCAL REGISTRAR (Mo/Day/Yr) October 28, 2013 | 24c. DEATH DUE TO COMMUNICABLE DISEASE YES ☐  NO ☒ |

**CAUSE OF DEATH**

| | | |
|---|---|---|
| 25. IMMEDIATE CAUSE (ENTER ONLY ONE CAUSE PER LINE FOR (a), (b), AND (c).) PART I | (a) Pending Autopsy | Interval between onset and death |
| CONDITIONS IF ANY WHICH GAVE RISE TO IMMEDIATE CAUSE STATING THE UNDERLYING CAUSE LAST | DUE TO, OR AS A CONSEQUENCE OF: (b) | Interval between onset and death |
| | DUE TO, OR AS A CONSEQUENCE OF: (c) | Interval between onset and death |
| | DUE TO, OR AS A CONSEQUENCE OF: (d) | Interval between onset and death |

| | | |
|---|---|---|
| PART II OTHER SIGNIFICANT CONDITIONS-Conditions contributing to death but not resulting in the underlying cause given in Part I. | 26. AUTOPSY (Specify Yes or No) Yes | 27. WAS CASE REFERRED TO CORONER (Specify Yes or No) Yes |

| | | |
|---|---|---|
| 28a. ACC., SUICIDE, HOM., UNDET., OR PENDING INVEST. (Specify) PENDING INVEST. | 28b. DATE OF INJURY (Mo/Day/Yr) | 28c. HOUR OF INJURY | 28d. DESCRIBE HOW INJURY OCCURRED |

| | | |
|---|---|---|
| 28e. INJURY AT WORK (Specify Yes or No) | 28f. PLACE OF INJURY - At home, farm, street, factory, office building, etc. (Specify) Mountain | 28g. LOCATION   STREET OR R.F.D. No.   CITY OR TOWN   STATE 25 miles west of Hwy 488 south Jo's Way  rural White Pine County  Nevada |

### STATE REGISTRAR

503071

### CERTIFIED COPY OF VITAL RECORDS

This is a true and exact reproduction of the document officially registered and placed on file in the office of the State Registrar and Vital Records.



SIGNATURE AUTHENTICATED

DATE ISSUED: **10/28/2013**

This copy is not valid unless prepared on engraved border displaying date, seal and signature of Registrar.



VRS-Rev-20120522a

# EXHIBIT B

# EXHIBIT B

**Law, Rebecca**

| | |
|---|---|
| **From:** | McElhinney, David C. |
| **Sent:** | Wednesday, January 29, 2014 8:09 AM |
| **To:** | Simpson, Jay; Wand, Peter R. |
| **Subject:** | FW: JoAnne Garrett Trust |

**From:** Peter Smith [mailto:peterjsmith@att.net]
**Sent:** Tuesday, January 28, 2014 4:44 PM
**To:** McElhinney, David C.
**Cc:** Carolyn Garrett
**Subject:** JoAnne Garrett Trust

Mr. McElhinney:

This is to inform you that I do not represent Carolyn Garrett regarding any matter, including specifically any issues concerning the trust of JoAnne Garrett.

Carolyn Garrett is copied on this email. She can be reached at 775 234 7209, or at PO Box 130, Baker, NV 89311

I am giving Carolyn your phone number as 823 2900 and your mailing address as
Lewis and Roca
50 West Liberty St. # 410
Reno, NV 89501

Thank you,
P. Smith

++++++++++++++++++++++++++++++++++++++++
Peter J. Smith, Esq.
755 No. Roop St. # 108
Carson City, NV 89701
{775} 882-9441
Fax   882-9056


NOTICE: This communication is confidential. If you receive this communication in error please reply so we will know and delete your copy.

# EXHIBIT C

# EXHIBIT C

# LEWIS ROCA ROTHGERBER

Lewis Roca Rothgerber LLP
50 West Liberty Street
Suite 410
Reno. NV 89501-1922

David C. McElhinney
Admitted in: Nevada and California
Direct Dial: 775.321.3414 | DMcElhinney@LRRLaw.com
Direct Fax: 775.823.2929

February 4, 2014

<u>Via email and U.S. Mail</u>
(Email address: raycartimm@outlook.com)
Carolyn Garrett
P.O. Box 130
Baker, NV 89311

Re: The Joanne Garrett Family Trust

Dear Ms. Garrett:

I am in receipt of your emails to me dated January 21, and January 27, 2014, regarding the Joanne Garrett Family Trust. Your emails have been forwarded on to UBS Financial Services ("UBS"). UBS takes strong exception to the baseless accusations regarding the actions of UBS employees in your emails. You have distorted and misrepresented the facts of this case, and I can assure you UBS' questions as to the enforceability of the Trust documents are neither frivolous nor unjustified. The circumstances of your mother's passing in relation to the timing of her execution of the Amended Trust document, in and of itself presents questions about potential undue influence, requiring my client to conduct appropriate due diligence before complying with the distribution request set forth in the document. As a separate matter, the transfer set forth in the Amendments to the JoAnne Garrett Family Trust is presumed to be void in accordance with Nevada law. This letter will provide you with details as to why UBS currently regards the transfer to be void.

In a letter dated December 12, 2013, accompanied with attachments, attorney Peter Smith makes the following representations to UBS Financial Services:

1. On August 9, 2002, Mr. Smith prepared a document entitled Declaration of Inter Vivos Trust Joanne Garrett Family Trust (the "Trust"). Mr. Smith enclosed a copy of the Trust with his letter to UBS Financial Services. Mr. Smith mailed the Trust to your mother. Upon her receipt of the Trust, your mother signed the same on August 12, 2002, before a notary. Your mother mailed the executed document back to Mr. Smith's office on August 24, 2002. Section 6.2, page five of the Trust identifies nine beneficiaries who are to share the assets of the Trust in varying percentages as set forth in the document.

2. On March 1, 2013, Mr. Smith spoke with your mother about some changes she wanted to make to the terms of her Trust, changing the distribution upon her death to favor you, her daughter, Carolyn Garrett.



LEWIS ROCA
ROTHGERBER

February 4, 2014

Page 2

3. Mr. Smith then prepared a document entitled Amendments to the Joanne Garrett Family Trust (the "Amended Trust") and he enclosed a copy of the same with his letter to UBS Financial Services. Page one of the Amended Trust changes the language of Paragraph 6.2 of the Trust, regarding the distribution of the assets, deleting all language regarding distributions to the nine named beneficiaries identified in the Trust, and instead directing all of the assets of the Trust to be distributed to you.

4. At the time Mr. Smith spoke with your mother about the changes she wanted to make to the Trust, he identifies you as your mother's primary care giver.

5. Mr. Smith expressly acknowledges in his letter the existence of a Nevada statute that creates a presumption of undue influence when an elderly or infirm person makes transfers of property in favor of a primary caregiver.

6. In an effort to overcome what Mr. Smith refers to as a "presumption of undue influence," he prepares and executes a document entitled "Certificate of Independent Review" wherein he concludes that the transfers of property and powers in the transfer instrument that otherwise might be invalid pursuant to NRS 155.097 are valid because the transfers are not the product of fraud, duress or undue influence. Mr. Smith signed the document on March 5, 2013. Mr. Smith included a copy of the Certificate of Independent Review in his letter to UBS Financial Services.

Nevada law is clear that a transfer (in this case the Transfer Instrument intended to effectuate the transfer was your mother's Amended Trust) is presumed to be void if the transfer is effective on or after the transferor's death and the transfer is to a transferee who is a caregiver of the transferor. (NRS 155.097(2)(b)). In this case, Mr. Smith has acknowledged that you were the caregiver to your mother at or about the time she executed the Amended Trust, leaving all of her trust assets to you. Therefore, according to Nevada law the Amended Trust is presumed to be void.

In an effort to render the presumption inapplicable to the Amended Trust, Mr. Smith prepared and executed a Certificate of Independent Review. However, Nevada law requires that the transfer instrument (the Amended Trust) be reviewed by an "independent attorney" who (a) counsels the transferor (your mother) about the nature and consequences of the intended transfer; (b) attempts to determine if the intended consequence is the result of fraud, duress or undue influence; and (c) signs and delivers to the transferor an original certificate of that review.

NRS 155.094 and 155.097(2)(a), read in conjunction with one another expressly provides that the term "independent attorney" does not include an attorney who drafted the transfer instrument, or one who has served as an attorney for the caregiver. Since Mr. Smith drafted the transfer instrument (the Amended Trust), and since he, on more than one occasion, identifies himself as your attorney, we

| LEWIS ROCA | February 4, 2014 |
| ROTHGERBER | |
| | Page 3 |

do not believe that he meets the Nevada statutory definition of "Independent attorney."  Therefore, according to Nevada law the transfer is presumed void.

I have had several telephone calls and email exchanges with Peter Smith during the month of January wherein we discussed Nevada law, and my client's very real concerns about the Amended Trust being legally void, and his lack of status as an "Independent attorney." Mr. Smith and I discussed several options designed to streamline and speed up the process, including obtaining an agreement and release of claims from the nine beneficiaries identified in the August 12, 2002, Trust, wherein they could each expressly acknowledge (a) that the Amended Trust was validly executed by Jo Anne Garrett on March 15, 2013; (b) that Jo Anne Garrett's execution of the Amended Trust was not the result of fraud, duress or undue influence; and (c) that you, Carolyn Garrett are the sole trustee and beneficiary of the Amended Trust.

On January 28, 2014, I received an email from Mr. Smith advising me, for the first time, that he would not be representing you regarding this matter, and that I should direct all further communications directly to you.

I trust that this letter adequately expresses my concern and my client's concern that the transferring document (the Amended Trust) is void, in accordance with Nevada law. I am interested in exploring options with you as to how we can work together to establish the validity of the Amended Trust, and thereafter distribute the assets in accordance with its express terms. Please give me a call at your earliest convenience to discuss some ideas I have as to how we can accomplish this goal without the necessity of filing a court action. My direct phone number is (775) 321-3414.   I look forward to hearing from you at your earliest convenience.

Best regards,

David C. McElhinney

DCM/lr

# EXHIBIT D

# EXHIBIT D

Carolyn A. Garrett
Trustee, JoAnne Garrett Family Trust
P.O. Box 130
Baker, NV 89311
Email: raycartimm@outlook.com
Fax: 775 234-7208
Phone: 775 234-7209

David McElhinney
50 W. Liberty St. Suite 410
Reno, NV 89501-1922

Via Fax and Email
dmcelhinney@lrrlaw.com
Fax: 775 823-2929

2/18/2014

Dear Mr. McElhinney,

Thank you for your reply to my two January 2014 emails I am afraid that my mother's Trust attorney did not inform UBS when I asked him to, that I did not have an attorney defending me against UBS. Please see Exhibits' "E" 1-2," "F", "G," and "H" for the directions given to Mr. Smith on the subject of UBS's problems. Although you requested we speak by phone in your letter, I prefer to have our "discussions" in the form of writing – in emails or faxes, if you don't mind.

I still need UBS to send me, immediately, the "contracts" between Pain Webber, UBS (and Met Life) and the Settlor (depositor) when the deposits were originally made and any renewals of those contracts. I asked for UBS's ADV Form, also. I cannot make any decisions or final statements concerning the business I am required to conduct with UBS in behalf of The Trust until UBS acknowledges my request. (See NRS lll.741).

At this point we are trying to sort out if and why there is any aspect of The JoAnne Garrett Family Trust that is appropriate for UBS to be questioning, right?

I believe UBS's wish to enter the Trust into the Courts jurisdiction is unnecessary and without justifiable reason with respect to the amount of "due diligence" the law requires. I am confounded by your reference to "the enforceability" of the Trust documents! UBS's fiduciary 'duties' were transferred (as NRS111.761 says, page three herein) from the first Trustee of the Trust (it's Settlor) to the Successor Trustee upon the Settlors death. Correct me if I am wrong, but none of UBS's expressed concerns with the Trust have to do with the Trustee? UBS wishes to take responsibility for all of the "past" beneficiaries of The Trust, yet the "duty" to any beneficiary's lies with The Trustee of the Trust.

Carolyn A. Garrett

First and foremost, as I stated in my January 21 communication to you I can find no instance in Statute or in the Rules of the various directives UBS is obligated to follow, which would make UBS libel to anyone when as 'transferee' they follow the instrument as it is written. The liability is clearly passed on to the Trustee. See Exhibit "T" and my last correspondence for examples of this. Even if you have concerns with the way JoAnne Garrett's attorney Mr. Smith drew-up her wishes I believe they should not be of significant consequence to UBS because no person is contesting the Successor Trustee nomination or any part of her Trust and no "interested person" is coming forward to say they have any proof that JoAnne was "manipulated" when she had Mr. Smith draw-up her Amendments to The Trust. UBS seems to be only party drawing such conclusions.

It is now well past the time allowed for UBS to comply with the Successor Trustee's requests to have the new Trustee's name replace the deceased Trustee's name as owner and responsible person for the accounts UBS is holding in the Trust's name. Just as the Successor Trustee became Trustee immediately upon the death of the original Trustee, the law states clearly that UBS as transferee must comply with the Trustee's instructions immediately "upon request." As is put forth in the Nevada Law 132.010 on the subject of wills and estates, 'this title must be liberally construed so that a speedy settlement of estates is accomplished at the least expense to the parties"... there is the opportunity now to do this without causing the Court to apply that same rule because of an unfounded claim. Perhaps having a local Nevada attorney "review the local laws" was warranted, but UBS has now spent far more time than it took to do that. The fact which I have previously pointed out, that is with limited or no liability when the transferee complies with the settlors explicit wishes in the instrument UBS has had for twelve months, I question any reason for delaying the transaction. In review of your Feburary4th letter, noting all of the misinformation you seem to have based your conclusions on, I will offer a few facts at this time for you to consider. That February 4th letter being the first time UBS had communicated with either my mother or me about "their concerns" with The Trust being of key importance, I hope these facts along with the Exhibits backing them up (with letters, bills, and the list of "contacts" UBS may call to confirm any facts) will allow UBS to understand that no problems exist. Just as I may be allowed to understand what UBS has done, is doing, and should now do, when I have been sent the contracts and ADV Form.

When JoAnne stated her "intent" for her Trust on page 2, Article II, 2.2, her wishes were very clear. I hope we can cooperate in strict compliance with her wishes of not subjecting her "non-probate Trust" to the jurisdiction of the Court and that we can do that swiftly and without further delay.

Your letter states that "the circumstances of my mother's passing in relation to the timing of her "execution" of the Amended Trust, itself presents poroblems? You say that when she amended her Trust "presents questions about potential undue influence"...? Please excuse my ignorance as I interpret the Statutes, but I am going to have to ask you to qualify that statement thoroughly – you certainly do not in your one letter to me! There is absolutely no limit set in the law for the "timing" of any Amendment; UBS has presented no proof that there was any tampering 'with my mother's wishes' or that there was undue influence when she decided upon the necessary amendments to her Trust.

UBS's incorrect assumptions about JoAnne's "condition" in March 2013 are likely based on the interactions that JoAnne and her POA had with UBS personnel in the months before her death? These interactions actually refute any concerns about the validity of the Trust Amendments, given that she changed nothing. The UBS personnel, as I have previously supplied you evidence in the Exhibits and do so further here, were unprofessional and inconsistent in the conduct of their duties and therefore unable to accurately assess or represent any problems with the Trust or the POA documents.

2 •

We were well aware that the simple process of my once monthly visits to JoAnne's house to help organize and pay the bills had a few times prompted her anger and/or caused her to make complaining phone calls to UBS, the other POA, or her attorney. JoAnne decided that I should not "mess with her paperwork," that my filing system was not good, and even that I should be removed as one of her POA's. The next hour or the next day she would call me or whomever her complaints had gone to and announce that, "Carolyn and I are on the same page about everything." See Exhibit "U." I was aware that my mother also made a few calls to UBS employees to cancel checks she had written due to these 'changes of mind' also. I called JoAnne's attorney Mr. Smith on one of these occasions to seek his opinion about how to handle the problem. Being told by him that he really could not advise me I tried to ignore the problem and continue to help her. Because Mr. Smith gave me the impression that he wondered if there was a valid reason, other than dementia, for my mother declaring "I should not be in charge of her business" one or two isolated times, I forwarded him one of the emails JoAnne would send to me when she changed her mind once more. (See Exhibit "U") The person I addressed JoAnne's feelings of anger at "losing control" was always the other POA, Christine. She had come up with solutions to alleviate those feelings such as establishing a local checking account that was not attached to all of her assets. That my mother's dementia came on so rapidly was shocking to all of us. That it existed when she decided upon her Amendments to her Trust in 2012 or even when Mr. Smith drew them up in February-March of 2013, (when no one who knew JoAnne would have suggested she had any more than normal memory loss), is simply incorrect.

As to the UBS employees who could have suggested any "undue influence" was taking place or caused reason to question JoAnne's Amendments, I have already presented at length Mr. Spidells abuse of his powers which cumulated the day before my mother became stressed, got lost and died – I'll simply add that SOMEONE was asserting undue influence and it was not me. When Tami, at your Billings branch took it upon herself to notify me personally by phone (having gotten my phone number from JoAnne I guess, when told of my designation of POA around 7/2013) that I should not allow my mother to conduct business with UBS anymore because Tami felt that my mother was "too out-of-it", I was surprised since I did not know who Tami was. Tami's refusal to (later) return the call my mother made to her asking for a second credit card for her UBS Visa account in her daughter's name (to pay bills by phone and pay for groceries she would order) was shocking  and highly irregular behavior for a bank. I was told by Tami, after my mother reported she had lost her credit cards, that she would not issue my mother another card as the client had requested. Yet, on the next UBS Visa statement another UBS credit card number is listed!  To say Tami's 'picking and choosing' the calls from JoAnne she would "listen to or abide by" (the person she had declared was suffering from dementia) was irregular would be an understatement.  Please see – in Exhibits "J" and "K" that it was Tami's directive to JoAnne at that time that calls to UBS should only be made by her when I was present also.

When I noticed the new card number on the UBS Visa statement as my mother and I were doing the bills together I called Tami. All of a sudden her earlier directive about my mother only calling UBS if I was with her was to be ignored. Tami would no longer say a word to me and I was given Mr. Spidells phone number. Mr. Spidell refused to say one word about the new credit card to me, knowing full-well that UBS had the certified paperwork with my POA designation. I learned later that Mr. Spidell had already been taking some directions from the woman with dementia – as well as giving them, as documented in Exhibit "Q." He simply ignored the signs of dementia which Tami was fully aware of, ignored the POA document UBS had been sent, and took complete control of all matters concerning my mother's accounts right up to the day my mother passed away. Perhaps Tami and Mr. Spidell's interpretations of UBS's duties to their clients would be cause for great concern? Certainly any 'rumors' either of them tried to pass off as the truth should be considered invalid due to their continual misconduct and the questions  which obviously follow about their judgment.

3

Carolyn A. Garrett

The only actual statements about JoAnne's "condition" around the March 2013 date you use in your "timeline" that I am aware of, were made by her attorney and were certified by him as being true. If we may 'get past' for a moment your assertions about his having 'misused' the legal avenue to refute any "care-givers' influence, what both his certified statement about my mother's condition on that date and in his letter in Exhibit "B" where (the attorney in good standing with his State's Bar Association) restates his belief that he was certain JoAnne had expressed her own desires in her Amendments, and that she could not have appeared more competent to him. Those are the obvious written appraisals we have, by a believable source of JoAnne's condition around March 2013, are they not?

Your letter states that UBS has determined (or you as their Nevada lawyer have personally determined?) that the way in which the Trust's attorney, Mr. Smith, presented the Amendments for The Trust was wrong or misguided and therefore that makes the new document null and void? Please note that UBS had copies of the complete Trust well before JoAnne Garrett died-with her personal trust attorneys "Certificate of Independent Review" which was made-up to go with the Amendments. Mr. Smith had sent UBS copies of the three new documents he had prepared for JoAnne – The Amendments and "Certificate" and also the notarized POA request she had made for UBS, in March. UBS certainly had a copy of the documents when Tami started sending out supplemental POA forms, in July 2013. Since UBS was 'scrutinizing' all of those documents in June and July because they were "scrutinizing" the POA designations(as the Exhibits clearly show) and JoAnne was available to answer questions about them, this would have been the appropriate time to question her about the validity of the "Certificate of Independent Review." She might have answered questions about the "timing" of her Amendments and about the new POA designations, also.

I think the time for UBS to "accept" JoAnne's changes to her Trust has long since passed as per NRS 111.755. The papers were delivered well before my mother's death and were all certified and deemed legal as far as the Settlor knew, and UBS did not dispute their legality as per NRS 111.759 and NRS111.761:
---    NRS 111.755   Agreement between owner and transferring entity; authorized content of contract concerning such agreement; effective date of designation of beneficiary when transferring entity's acceptance required.
      3.     When a beneficiary designation, revocation or change is subject to acceptance by a transferring entity, the transferring entity's acceptance of the beneficiary designation, revocation or change relates back to and is effective as of the time when the request was received by the transferring entity.

NRS  111.759   Proper execution and delivery required for transfer of property upon death of owner.   A beneficiary designation, under a written instrument or law, that authorizes a transfer of property pursuant to a written designation of beneficiary transfers the right to receive the property to the designated beneficiary who survives, effective on the death of the owner, if the beneficiary designation is executed and delivered in proper form to the transferring entity before the death of the owner.

 NRS  111.761   Proper execution and delivery or acknowledgment required for assignment of right to receive performance effective upon death of owner; other methods of assignment not precluded. 1.    A written assignment of a contract right which assigns the right to receive any performance remaining due under the contract to an assignee designated by the owner and which expressly states that the assignment is not to take effect until the death of the owner transfers the right to receive performance due under the contract to the designated assignee beneficiary, [or Trustee] effective on the death of the owner, if the assignment is executed and delivered in proper form to the contract obligor before the death of the owner or is executed in proper form and acknowledged before a notary public or other person authorized to administer oaths. A beneficiary assignment need not be supported by consideration or be delivered to the assignee beneficiary.

4 •

The laws above seem straight forward to me nevertheless, I will continue to 'address' every possible 'problem' you belatedly express about The J.G.F. Trust.

UBS's interest in contacting any "old beneficiary's" is just not relevant in determining the validity of this Trust. As the successor Trustee, I fail to see what importance either the successor trustee named in the ten year old subsequently revised Trust (who had resigned long before the Amendments were officially typed-up) or the subsequently removed by the Settlor beneficiaries (who were also removed because of very specific changes in the life and relationships of the Settlor) have to do with the current Trust document. JoAnne did not talk to the 'old' beneficiaries about her Trust (aside from the questions she may have asked Bodhi and her children) ever, nor did they have any knowledge about her state of mind while making the amended Trust because they were not around her at all.

The information you have about when Mr. Smith started talking to my mother about the Amendments she wished to make to her Trust is incorrect. Since it is Mr. Smith's memory of events you seem to quote in your letter as far as "the timeline" of events that took place, allow me to use his writing to my mother (the bill he presented when he sent the new documents to be notarized in Exhibit "A") as a fairly accurate 'timeline' of the contact JoAnne had with her attorney regarding her Amendments. That bill clearly shows that she begins rewriting or thinking about how to rewrite parts of her Trust in 2010 or before. It was 7/20/10 when my mother contacted him about the Donald E. Garrett Family Trust problems, we see. She hired him to 'review it' because her daughter Diane had taken all of its 'funds' (away from generally the same beneficiaries as JoAnne's Trust had, at the time – see Exhibit "S" (1-3)) and the Trustee of that Trust would not (and never did) give an accounting to anyone. JoAnne had hoped Mr. Smith might advise on how to get that accounting. Mr. Smith's bill says that her call about David was also on that date. Her questions about David would no doubt have referred to the fact that her son David had died in 2009, but that question was about HER Trust and the changes she needed to make because of that.

Mr. Smith's bill states that it was approximately a year later that the 'old' successor trustee (Cynthia Mitchell) was in contact with him about her resignation as trustee nominee, although I was aware of her and JoAnne's decision that "friends" should not be asked to deal with Family Trust's, well before that time. As per the date of 11/19/12 on that same bill – when my mother finally had to ask him to fax another copy of her Trust, it was obviously then that she was ready to insert her Amendments into her original Trust and so needed that copy he sent, to physically do that. By 2010  several family members and friends(including C. Mitchell) had been through traumatic family issues because of Estates and they had been urging her to update her documents to reflect specifically ; D.E. Garrett's death and the 'outcome' of that Family Trust; her son David's death; and that her friend Cynthia did not want the successor trustee job.

It would be more than reasonable if UBS wished to confirm any of the above events which caused the Trust to be revised. Obviously, the people with whom UBS would confirm any of these events would be the persons who have direct knowledge of them and were consulted about the changes at the time they were made – in 2012 or before. Aside from my narration of any facts concerning "the timing" of my mother's amendments using Mr. Smith's paperwork as a guide, in Exhibit "C" I have given you the contact information for the family members who visited JoAnne in 2012 and had specific knowledge of the amendments which had already been decided upon and also of JoAnne's condition at that time.

Although I have pulled out JoAnne's phone bills for 2012-2013 so I actually know that Mr. Smith's representation of who made the calls to him is incorrect in that same bill of his, it is not real important unless UBS disputes the facts I give about the general timing and content of calls to Mr. Smith. In short form, I was only involved with the

5 •

Carolyn A. Garrett

amendments because I was engaged by my mother to write them down due to her hand shaking (would UBS like a copy of her anti-shake prescription?). It was my typing-up of her list and my fax machine she relied upon to fax the changes to her lawyer, and it was naturally I who called to check to see that he got them. It was 11/22/12, as Exhibit "V" illustrates with her signed and witnessed statement , when JoAnne and I finally got around to the fact that she had long ago been paid in full by me for the old cabin I'd bought from her. It was around that time that we addressed the problem with Mr. Smith, as far as the deeds he held for the Trust. We reminded him again, as his bill says, in March of 2013. I contacted him about the re conveyance of Deed of Trust again. That was the extent of my involvement with JoAnne's Trust Attorney at the time he actually typed-up the three documents he produced in March 2013 and before. Is that considered "influence?"

I believe it would be helpful if you will look at the POA document Mr. Smith prepared for JoAnne at the same time he prepared the Amendments. I have included it here for you in Exhibit "P" (1-3). That signed, certified, and legal POA document should give a clue for UBS about JoAnne's intentions. It may become apparent when reading all three of the new document's UBS was sent at that time that the people who appear in  Amendments AND the POA designations were likely the people she trusted and were close enough to her to be the current Trustees/beneficiaries she wished, in the order she wished her assets be handed-down.  Are you contesting the (3) successor trustee's in the Amendments?  Studying the difference between the Original and the Amended Trust in that respect should also clearly illustrate for UBS attorneys that JoAnne's desire to keep her Trust out of the hands of attorneys and Courts had become even stronger in the ten years – because she no longer wished to leave anything about the designation of any successor trustees up to the Court's discretion, until three people had died, anyway.

I cannot say why Mr. Smith determined I was "the primary care-giver." I know for certain, as would many others who were close to JoAnne at that time that I was not. Mr. Smith did not personally know anyone in the Garrett family and had only met with my mother personally back in 2002(as far as I know) because she hired him to make-up her legal trust document. Mr. Smith resided hundreds of miles away from any Garrett family so could not personally know such a thing. JoAnne would never have represented to Mr. Smith that I held that title, either. Perhaps Mr. Smith should show UBS any written statement by JoAnne which would be proof that he was told I was her caretaker?  As shown in the writing JoAnne had in her file on the subject, in Exhibit "B" (and the only mention of that 'presumption' in writing which I am aware was ever made) Mr. Smith's only notation that I was "care giver" and his brief explanation about why he had written and sent 'the Attorneys Certificate" was sent to JoAnne after- the- fact.  The "Certificate" had already been made, signed and delivered when she first realized that he had called me "care giver, as the dates clearly show. I believe that any reasonable person would deduce, as she and I discussed when she showed it to me, that it was just one more guarantee by her attorney that there would be absolutely no problem with her Amendments, and certainly there was no reason to deny his 'Certificate of Independent Review' –when a 'normal person' did not know the exact law or what might be construed by mention of care-giver.

I consulted with Christine Kolisch (JoAnne's close family member and my successor trustee and JoAnne's co- POA nominee) about all matters involving the 'age related changes' that my mother was going through. She and I had discussed and flatly decided that it was best that a family member NOT be the primary care-giver back in 2012; decided I would NOT be that for my mother; and then she and I and JoAnne had all agreed who the care giver would be.  That person, Mu Fowles, had been hired by Chris and by me and also by Bodhi, at separate times in the two years before my mother's death.  I have included Mu's contact information as well as the two alternate caregivers I also hired, for when both day and night caregivers would be used None of the care-givers has been contacted by me since October 2013 when they lost those jobs. Please feel free to settle the care giver question by

6 •

contacting any or all. Please contact Mr. P. Smith - to request any proof he has in writing that I was ever referred to as a caregiver at all.

As to your claim that the Amendments to the J.G.F. Trust are void because Mr. Smith used his Certificate of Independent Review incorrectly or because he was not "independent" (I already went over that here) or because he called me a caregiver (also covered, above) – Certainly UBS would not presume it should drag the current Trustee into Court (and expect the Trust to pay any expenses) to debate Mr. Smiths "presentation" of the Amendments? He states that his inclusion of the "Certificate" was to apparently cover all bases? Kindly review the third paragraph in Exhibit "B" where he explains to JoAnne why he thinks it is necessary. I would certainly argue that the documents were produced in good faith by that attorney and whether he was mistaken when he reviewed the laws and he was mistaken by calling me a care-giver, the "intent" which JoAnne Garrett had, is not lost! I cannot be expected to argue for him, just as I cannot hire him as my private attorney to argue the case because that would make him "my attorney" and would nullify his "independent" status. I might also point out that it is safe to assume that any reasonable person who has paid an attorney who is in good standing would be entitled to naturally assume that a document he has prepared, signed and certified, and explained is necessary (and will overcome any doubts about her true wishes) to accompany the other document which he has reporesented as a legal non-probate Trust, would be entitled to the assumption that the attorney can be kept to his word. And that the person paying that attorney will obviously not be expected to further take the time to read any Statutes the attorney has used.

You claim that Mr. Smith acknowledged I was primary caregiver "on or about the time she executed the Amended Trust?" Again, I honestly and absolutely dispute the truth of that statement and it should be between UBS and Mr. Smith to only put-forth facts they can prove. The dates on the items I have included here tell a very different story. Using the date that Mr. Smith sent back the final documents to have signed and notarized as "the date JoAnne wrote her Amendments" is absurd.

You state that Mr. Smith represented himself as "the care-givers attorney" and also that "on more than one occasion he identified himself as my attorney." The correspondence I have included in Exhibits "D" through "I" shows why he was hired in December by the new Trustee of The Trust to take care of Trust business. Further, you can see by some of my emails to him that I specifically told him, three different times, that he would not be representing 'me' against UBS! I simply cannot be responsible for his representations to you when I was completely unaware of your (apparently) long, drawn-out calls with him! Nor can I be held responsible for reading and understanding the Statutes involved in the definition of what an "independent attorney" is. (As your last 2 paragraphs on page 2 of your letter seems to suggest I do.) I reasonably deferred to the Trust attorney as Trustee, until I felt he was not forthcoming about any problems or questions about the Trust and was 'billing me' for unauthorized communications with UBS.

To be quite clear: Mr. Smith could not "acknowledge I was care-giver" at any time because he had never been told such a thing by any person. The "timing" you are saying is "suspicious" has been misrepresented by Mr. Smith also and therefore cannot be used as "information UBS has." Mr. Smith will have to bring forth any proof that I was called care-giver by any person. The dates on his March 5 bill and the accompanying letter he sent along with the "Certificate" he made up saying I was care-giver for the first time, speak for themselves and will correct your misrepresentations on that subject. The calls you may make to the actual caregiver(s) and to Chris Kolisch confirming 'our decision about caregivers" should be more than sufficient to eliminate that misconception altogether.

Carolyn A. Garrett

Your suggestion that I review NRS 155,097(2)(b) and any other laws in conjunction with each other really takes things too far. I cannot be expected to argue with seasoned attorneys (you or UBS's in-house-attorneys) the subtleties of laws read in conjunction with one another. I can, however, express to you what "any person would reasonably expect" from their attorney when he prepares documents for them: that person has the right to presume they are not expected to have to find and read every Statute which could ever be applied to any document their attorney has represented is a Legal instrument. You can without any doubt assume that JoAnne had not scrutinized any of the Statutes being quoted by you now to dispute the validity of the document she had every right to believe was legal and binding. If JoAnne's attorney should have warned the Settlor that The Trust he prepared for her was in question or would be – for any reason, then it is logical that the law UBS now quotes should have been 'addressed' with Mr. Smith or the Settlor during the seven months UBS had the documents to review– when the Settlor could have been made aware of said 'problems' before she died.

As I mentioned earlier, Bodhi Garrett came from Thailand with his family and joined his mother and stepfather- Christine Kolisch and Craig Lovell from Carmel, on a trip to visit with JoAnne in 2012. At that time they were told of the Trust's impending changes because JoAnne had already decided on every one of them Please feel free to contact them to help refute your misconception about "suspicious timing" or "when JoAnne wrote her Amendments or "care-givers" in JoAnne's life. Their memories of conversations about the Trusts Amendments I am sure, will be similar to mine – Also our conversations about JoAnne being more forgetful but still very much "in charge" and having no care-givers may be recalled for you JoAnne's daughter Diane, who lived only 70 miles away had not seen her mother since her son's death in 2009. They occasionally talked on the phone but Diane could certainly not be expected to have an understanding about her mother's condition at any time, just as the other 'old' beneficiaries' could not since there had been no visits by them since 2009 either. JoAnne did not even notify Diane that she had been taken out of her Trust. I found this out recently because of Diane's questions about 'the reading of the will.' Diane had finally admitted to JoAnne that she "got for herself" a large sum of money when her father died so apparently there was no reason for JoAnne to have to explain why she would be left out of her mother's Trust. I think those things speak for themselves, but I can certainly produce a large amount of written proof, too.

I sincerely hope I have managed to address UBS's 'concerns' with respect to the validity of the amendments, the role of Peter Smith, and my role in JoAnne Garrett's life. I continue to suffer great hardship due to UBS's delay in performing their duties as transferee. I would greatly appreciate your close attention to the information I have provided, and look forward to a swift and amicable conclusion to this process. Also, kindly notify me upon receipt of this letter and the (faxed) Exhibits. Would you require "hard copies," also, of all my communications?

Sincerely,

8 •

Carolyn A. Garrett

Carolyn A. Garrett
Trustee, JoAnne Garrett Family Trust

9

# EXHIBIT E

# EXHIBIT E

**LEWIS ROCA ROTHGERBER**

David C. McElhinney
50 West Liberty Street
Suite 410
Reno, Nevada 89501

Direct Dial: (775) 321-3414
Direct Fax: (775) 823-2929
dmcelhinney@lrrlaw.com
Admitted in Nevada

Our File Number: (new)

March 10, 2014

*via certified mail*

Diann Catherine Martin
125 3rd Avenue
Ely, Nevada 89301

      **Re:**    **The Jo Anne Garrett Family Trust**

Dear Ms. Martin:

      I represent UBS Financial Services, the custodian of an account titled in the name of The Jo Anne Garret Family Trust (the "Trust"). I understand that your mother, Jo Anne Garrett, died on October 14, 2013. Please accept my condolences on your loss.

      Enclosed is a copy of correspondence my client received from Peter J. Smith, an attorney in Carson City, Nevada. The correspondence includes an amendment to the Trust dated March 15, 2013. The amendment identifies Carolyn Garrett as the sole trustee of the Trust on Jo Anne Garrett's death. The amendment also identifies Carolyn Garrett as the sole beneficiary of the Trust.

      Carolyn Garrett has requested that UBS Financial Services acknowledge the validity of the March 15, 2013 amendment and recognize her as the sole trustee of the Trust. Before complying with that request, I am trying to determine whether you, as a beneficiary of the Trust prior to the execution of the March 15, 2013 amendment, object to the validity of the March 15, 2013 amendment.

      If you object to the validity of the March 15, 2013 amendment to the Trust, please contact me at (775) 321-3414 or dmcelhinney@lrrlaw.com. If you have no objection, please sign the enclosed Authorization and Release in the presence of a notary public and return it to me at the address above. If I do not hear from you by March 18, 2014, I will assume that you object to the validity of the March 15, 2013 amendment to the Trust and will proceed accordingly.

      Sincerely,

*David C. McElhinney*

David C. McElhinney

enclosures
cc: Carolyn Garrett, via email to raycartimm@outlook.com

4351749_1



**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

O F F I C I A L   U S E

| | |
|---|---|
| Postage | $ 1.96 |
| Certified Fee | 3.10 |
| Return Receipt Fee (Endorsement Required) | 2.35 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 7.61 |

Postmark Here

Sent To
DIANN CATHERINE MARTIN
Street, Apt. No.; or PO Box No. 3RD AVE
City, State, ZIP+4 ELY NV 89301

PS Form 3800, August 2006          See Reverse for Instructions

7012 2920 0001 4114 6038

## Acknowledgement and Release

This Acknowledgement and Release is made by Diann Catherine Martin as of _____ (the "Effective Date").

1.      Jo Anne Garrett established The Jo Anne Garrett Family Trust on August 12, 2002. A copy of The Jo Anne Garrett Family Trust is attached hereto as Exhibit A.

2.      Jo Anne Garrett amended The Jo Anne Garrett Family Trust on March 15, 2013. A copy of the amendment Jo Anne Garrett executed on March 15, 2013 is attached hereto as Exhibit B.

3.      Jo Anne Garret died on or about October 14, 2013.

4.      As of October 14, 2013, UBS Financial Services Account No. BK 30705 D3 (the "Account") was titled in the name of The Jo Anne Garrett Family Trust.

5.      Pursuant to Paragraph 1.3 of The Jo Anne Garrett Family Trust, Carolyn Garrett became the sole trustee of The Jo Anne Garrett Family Trust as a result of Jo Anne Garrett's death.

6.      By executing this Acknowledgement and Release, Diann Catherine Martin acknowledges each of the following: (i) the amendment attached hereto as Exhibit B was validly executed by Jo Anne Garrett on March 15, 2013; (ii) Jo Anne Garret's execution of that amendment was not the result of fraud, duress or undue influence; and (iii) Carolyn Garrett is the sole trustee of The Jo Anne Garrett Family Trust.

7.      By executing this Acknowledgement and Release, Diann Catherine Martin fully and forever releases and discharges UBS Financial Services and its affiliates and related entities, parent and subsidiary corporations, present and former officers and directors, employees and assigns from any and all claims, liabilities, actions, causes of action, obligations, costs, damages, losses and demands, of every character, nature, kind and sort, existing from the earliest time to the Effective Date, whether known or not known (or hereafter arising from any conduct, acts, events or circumstances which have in any way occurred or begun to occur as of the Effective Date) related in any way to the Account or The Jo Anne Garrett Family Trust.


_____
Diann Catherine Martin

4351914_14193753.1

STATE OF _____        )
                                )  ss.
County of _____       )

     The foregoing instrument was acknowledged before me this ____ day of _____, 20___ by Diann Catherine Martin.


_____
Notary Public

My Commission Expires:

_____

2

4351914_1

# EXHIBIT F

# EXHIBIT F

# JUSTICE
## LAW CENTER

482 5th Street, P.O. Box 152023, Ely, Nevada 89315
T: (775) 289-4422   F: (775) 289-6863
justicelawcenterely@gmail.com

March 13, 2014

David C. McElhinney
Lewis Roca Rothgerber
50 West Liberty Street
Reno, NV 89501

Re:     The Jo Anne Garrett Family Trust

Dear MR. McElhinney:

My client, Ms. Martin, was pleased to receive your correspondence.  My client has retained our office to contest the validity of the amendment to her mother's trust.  Prior to your letter, Carolyn Garrett and attorney Peter J. Smith refused to provide us any information, including copies of the original trust agreement and the amendment.  We were in the process of preparing a petition requesting the court to order production of all trust documents.

My client objects to the validity of the March 15, 2012 amendment and seek to prove that Carolyn not only unduly influenced her mother, but that Jo Anne Garrett was not in the proper state of mind at the time the amended was made.

We ask at this time that you do not recognize her as the sole trustee of the trust and that you put a hold on the account until this can be resolved through the courts.

Best Regards,

Daniel Page, Esq.
JUSTICE LAW CENTER